The principle which governs all sales at auction, and especially judicial sales, is, that there should he full and fair competition. Any agreement or combination, therefore, the object and effect of which is to chill the sale and stifle competition is illegal, and no party to the agreement or combination can derive benefit from the sale.
Rice Hope, a plantation on Savannah River, containing- upwards of 400 acres in a high state of cultivation, and worth at least $40,000, the property of General Hamilton, during his possession was mortgaged by him: 1. To Frederick Kohne. 2. To Thomas Hanscome. 3. To James G. Moodie and William E. Turnbull, trustees of Barbara Barguet. 4. To Ann Timothy ; and 5. To Arabella North. The mortgages were successively recorded as they were made. The first and second mortgages were afterwards assigned to the Bank of Charleston.
In this suit, an inquiry was directed to ascertain the liens on Rice Hope, with their amounts, and the order in which, they were payable.
In pursuance of this order, the creditors went in before the master with their several claims, and on the 1st March, 1843, he made his report, that the mortgages were payable in the foregoing order, and that there was due for principal and interest:
To the trustees of Barbara Barguet, a colored woman, 5,178 00
To Isaac Telfair, a resident of Ohio, executor of Ann Timothy, 7,260 00
On the coming in of this report,- the cause was heard by his *357 Honor Chancellor Johnson, and on the 16th March, 1843, he made a decree, declaring that Rice Hope had been purchased with trust funds, and should be held bound by the said trusts, subject to the foregoing mortgages ; and ordered that those mortgages be foreclosed for the payment of the debts secured by them ; and that the property be sold at such time, and on such terms, for cash or on credit, as a majority in interest of the creditors, under the direction and control of the master, should determine.
Afterwards, on the 25th March, 1843, an order was made, which, reciting that the parties had agreed on the time and terms of sale, and that Mr. Cruger had been appointed trustee, directed the expenses of the plantation to be paid out of the crop of the coming year, and then the interest on the mortgages ; and that unless the amounts due on the several mortgages should be paid on or before the first of December next, the master should advertise and sell Rice Hope on the first Wednesday in January after, for one fourth cash, the rest of the purchase money in three annual instalments, with interest from date, payable annually, to be secured by bond and mortgage j and all parties to deliver possession to the purchaser, with muniments of title, &c. And that the master apportion the bonds of the purchaser in such amounts as might be convenient for distribution among the creditors, and apply the cash, first, to pay the costs of suit, and then the mortgages, according to their priority, and deliver the bonds to the creditors in satisfaction of their demands, as far as the same would reach. The creditors holding the first mortgages to have the choice of the first bonds, and the others to receive the latter bonds, all according to their respective priorities.
Pursuant to these orders, Rice Hope was advertised to be sold at the Exchange in Charleston, by Mr. Gray, one of the masters of the court, on the 3d day of January, 1844.
The debt to Arabella North had been at first secured by a mortgage of Hamilton’s wharf, and when the wharf was sold to James Adger, Rice Hope was mortgaged to her for the same debt; but how far the wharf continued to be bound, had never ■been determined between Mr. Adger and Dr. North. On the morning of the sale, it was ascertained by General Hamilton, and the Bank of Charleston, S. C., that James Adger had authorized Dr. North to bid 50,000 dollars for Rice Hope ; and that there was an arrangement between them to protect their inter *358 ests. The Bank of Charleston then authorized Mr. Gourdin to see Mr. Memminger, the attorney of Dr. North, and make arrangements to prevent him from bidding. Mr. Gourdin saw Mr. Memminger, and they agreed that Mr. Gourdin should bid for the Bank of Charleston, and that Mr. Memminger should not bid against him; and if he bought the property for 22,000 dollars, or under that sum, the Bank of Charleston should secure the debt due on the mortgage to Arabella North, but if the bidding went over 22,000 dollars, the agreement was to be at an end.
Notice was given to Mr. Gray, in consequence of which he refused to make titles ; and no money was paid, and he reported the sale as made to the Bank of Charleston at 11,000 dollars.
*360 Harper, Ch. This is called a motion to open the biddings upon the offer of an advanced price. I take it to be settled by the case of Young vs. Teague, Bail. Eq. 13, following Gordon vs. Sims, 2 McC. Ch. 158, that we have no proceeding similar to that of the opening of biddings in England. The former case was one in which the conveyance was executed and delivered, and stress seems to be laid on that circumstance by the reasoning of the court. But the principle on which the cases go is this, that by the falling of tins auctioneer’s hammer, and *361 the entry of the sale by the master in his books, the contract of sale is complete. Different from the English practice, according to which there is no contract till the biddings are reported, and the sale confirmed. With us, upon the falling of the hammer, and the entry of the sale, the purchaser has a right to demand a title as a matter of course, and as of course the purchaser in the present instance would have received it, but for the interference of the parties to this motion.
Being a complete executory contract, 1 must seek for something which will authorize me to set it aside, and it seemed to *362 be agreed that the motion was to be decided on the evidence before me, as if a bill had been filed for that .purpose. It is not an application to enforce an executory contract, in which case the court exercises a more liberal discretion, to refuse its interference. The purchaser of the land was entitled, as of course, to have the conveyance executed, and it would have been executed but for the interference of the intermediate."mortgagees. As observed in Young vs. Teague, “ the .commissioners are not limited to receiving bids or offers, but they are" directed to sell to the highest bidder, and to execute titles.” T.o authorize the *363 parties, however, to set aside, éven as an executory contract, there must be, I suppose, some ground- of fraudulent surprise or mistake. The English cases sometimes, purport to open the bid-dings after a confirmation of the sale, but these proceed upon similar grounds, and it is to be observed, that as the English legislature is not restricted from interfering with the obligation of contracts, courts may feel more at liberty to open or modify them than with us.
When it is said to be fraudulent for parties to agree not to bid against each other, at a public sale, or that one person should pay money to another not to bid against him, it is because such *364 conduct tends to prejudice the sale, to the injury of the owner, or perhaps of creditors having an interest in the proceeds ; but if it appear that the agreement did not, and could not, have any such effect, the doctrine of course will not apply ; but in the view which I take of it, the property sold for a higher price in consequence of the understanding between the Bank and the owners of North’s bond; by that understanding, as taken from the testimony, in case the plantation should be bid off for less than 30,000 dollars, it would remain subject to the original mortgage to the Bank for about 22,000 dollars, to North’s bond, 17,-000 dollars, and to the uncovered debt, as it it called, 16,000 dollars, making in all 55,000 dollars, If North or Adger had bid, as the intermediate mortgagees say they expected them to do, and as at one time they intended to do, the plantation would have been bid off at 50,000 dollars, so that creditors have been secured'to a greater extent than if that intention had been carried into effect, and the owner of the property (for whose protection such sales were chiefly intended) does not complain that the sale was injured, or the property sold at an inadequate price.
The true objection in the present case, is not that the owner of the property, or creditors generally, have been injured ; but that particular creditors have been injured and deprived of a priority, which they would have had. Now, suppose that the *365 Darlk and the owners of North’s bond, speculating on the chances of intermediate mortgagees failing to attend the sale, or their being unwilling to bid, or from their circumstances unable to purchase, had entered into the agreement in such event to bid off the property, as they have done, so as to gain the priority which they have gained, without doing anything to mislead or deceive the parties, or to deter them from attending or bidding, would there have been any thing fraudulent in this ? I confess I do not see on what grounds. Creditors are not the guardians of each other. Each is at liberty to take care of himself as he best can. I do not see what obligation the owners of North’s bond were under to bid for the benefit of the intermediate mortgagees. If they had bid as proposed, they must have suffered a great loss, most probably the loss of their whole debt; for if they had bid off at 50,000 dollars, and on re-sale the plantation had brought no more than 33,000 dollars, there would have been nothing left for their debt. Were they bound to submit to the loss, for the benefit of their prior incumbrance 1 In England, in case of severral mortgages, if the owner of the youngest buy in the first mortgage, so as to invest himself with the legal title, the intermediate mortgages will not be permitted to redeem without paying off the younger ; yet by this, the owner of the junior mortgage jostles the intermediate mortgagees out of their priority, as effectually as the owners of North’s mortgage have done in the present instance. Nor do I perceive any trick or artifice, or any characteristic or vestige of fraud, more in one instance than in the other; and shall we say, that that which the law allows and enforces is fraudulent, if done by the agreement of individuals'?
There being nothing fraudulent in the transaction itself, it is hardly contended that there was any artifice or fraudulent means practised to accomplish the object. Nothing was done to mislead or deceive the parties, or to deter them from attending or bidding, *366 nor anything; omitted which the parties were bound todo. The fact of the Bank’s finally agreeing to bid the property up to 30,000 dollars, is strong- evidence of the absence of any fraudulent intention towards the intermediate mortgagees. If it had been bid off at that price, 8,000 dollars must have been paid to the intermediate mortgagees, and the owners of North’s mortgage-have lost their debt.
And there is as little room for setting aside the sale, on any ground of accident or mistake. They supposed that the owners of North’s bond would attend and bid, and these had as good a right to suppose that the intermediate mortgagees would attend and bid. They were equally bound to do so for the protection of their own interests, and failing to do so, must take the consequence of their own laches ; the owners of the bond did not intend to bid for the property until the day before the sale, when, in consequence of what may be called a casual arrangement with Mr. Adger, they determined to do so. If this arrangement had not been made, could you class the spontaneous and unfounded impression under the head of mistake 1
The motion is dismissed.
From this order, the trustees of Barbara Barguet and Mr. Middleton appealed, on the following grounds :
1. That the motion before his Honor should be decided in the same way as if the purchaser of Rice Hope had come for a specific performance of his contract; and that the decision of this application should be made upon the contract, as it appears in the master’s report, viz : — a contract for the sale of property worth upwards of 40,000 dollars, for 11,000 dollars. And it is contended, that the inadequacy of consideration, with the circumstances of surprise on the parties to this application, furnishes a sufficient ground to set aside such a purchase; a fortiori, to prevent this court from confirming it, which is equivalent to a decree for specific performance.
2. But if the decision proceed upon the consideration of the price which the purchaser is actually to pay, then it is insisted that the difference between the price to be paid to the master, and the real price to be paid by the purchaser, is the result of an underhand agreement between the mortgagor, the first mortgagee, the last mortgagee and the purchaser, to the injury of the intervening mortgagees, and for that reason void.
In support of which proposition, they maintain,
2. That if this contract could not stand in reference to an ordinary case, between vendor'and purchaser, much less can it be supported in reference to a judicial sale ; because it is in violation of the decree under which the sale was made. By that decree, Barguet and Timothy were to be paid out of the purchase money next after the mortgage debt due to the Bank of Charleston,. S. C. By the contract which the court is called to confirm, they are not to be paid at all; and the purchase money which belongs to them, is to be appropriated by others.
3. That this attempt of the purchaser and parties, to set aside the, directions of the'court, as to the application of the purchase money, borrows no aid from the circumstance, that the purchaser is the assignee of the first mortgage. Because in this State the first mortgagee has no right at all to tack subsequent advances to his ‘prior security — much less can the assignee of the first mortgage tack subsequent advances to the mortgage assigned to him, against the positive decree of the court. Nor is it allowed in this'country or in any other, to a creditor, who knows of an intervening incumbrance, when he lends his money, to tack the new debt to the old, or to better his situation by getting in the legal estate.
4. That upon principles universally recognized at law, as well as in equity, the parties to this application should be relieved against the contract made by the master with Mr. Gourdin, for the Bank of Charleston, S. C.-, either by setting aside the contract of purchase altogether, or by compelling the purchaser, out of the money which his Honor considers as the real price of the property, to pay the mortgages of Barguet and Timothy, according to their rank, as established by the decrees of 16th and 25th of March, 1843.
C. G. Memminger, sworn. Says there were three interests in the bond and mortgage of Dr. North. The estate of North represented two-thirds, the estate of Baron one-third, and Mr. Adger a contingent claim of reclamation against him, which grew out of an unsatisfied mortgage on Hamilton’s Wharf, now Adger’s. The parties representing these various interests had a meeting, and they desired to avoid bidding, or having any thing to do with the purchase, if the debt could in any other way be secured, as the interests were so frittered up, that the purchase coul l not be made advantageously. It was finally agreed that Dr. North should bid to the amount which would cover his debt, to fifty thousand dollars, and if it were put down to him, it was agreed, that he should sell immediately, and Mr. Adger would lose half the deficiency, and the other parties the other half. This conclusion, after various other previous conferences, was come to the day before the sale. On the day of sale, Mr. Henry Gourdin called on witness and asked if the parties he represented had any other interest than to secure their debt. Witness replied that the parties wished to have their debt secured merely, and anxiously desired not to purchase the plantation. Mr. Gourdin then stated, that the Bank of Charleston held the first liens on the plantation, amounting to somewhere about twenty-two thousand dollars, and they were willing to make an arrangement by which, the debt witness represented might be secured, if they could agree. He asked if witness would be willing to take a mortgage of the property, for his debt, to come in after the Bank of Charleston, and to give time on that mortgage. Witness replied that time was of little consequence to his client, and such time would be given as the purchaser might require. Mr. Gourdin agreed to meet witness at his office in an hour afterwards, and witness had all the parties interested there at the meeting, viz : Mr. Gourdin, the President of the Bank of Charleston, Mr. Adger, Dr. North, and Mr. Ashby. It was finally agreed, that if the plantation sold for twenty-two thousand dollars, or under that, Mr. Gourdin or the purchaser was to give a mortgage to secure North’s debt, on an extension of time from three to five years, to come in *360 after the liens of the Bank of Charleston. That if the property went over twenty-two thousand dollars, neither Mr. Gourdin nor the Bank of Charleston would have any more to do with it, and the parties were to protect themselves as well as they could. It was also understood, that as it was uncertain what course the thing would take, witness was to go to the sale, and act as he deemed best for the debt of North; and witness was prepared to act on the understanding of the day before, and to bid as high as fifty thousand dollars. That just before the sale, and while the company was assembling at the sale, witness met Mr. Gourdin, who told him that the Bank of Charleston had consented to extend the arrangement, so as to authorize a bid as high as thirty thousand dollars. Upon witness saying, that would not do, if North’s debt was to be postponed to thirty thousand dollars, Mr. Gourdin said, no, the Bank was willing that North’s debt should come in immediately after theirs, in case the property was knocked down to them at thirty thousand dollars, or under; if it went above thirty thousand dollars, witness was to take care of his debt. In the conferences it was spoken of as an uncertain thing, whether the intervening mortgagees would or would not bid. Reasons were assigned why it was probable or improbable that they would bid; such as the comparative smallness of their claims, the difficulty of raising the money, or managing the property — others thought they would bid. Witness says, as soon as Mr. Adger came in, he was willing to bid as high as fifty thousand dollars, whether the Bank of Charleston came into the arrangement or not; if Mr. Adger had not come, Dr. North would have felt perplexed about it, as Dr. North’s claim was devisible among so many other persons. Witness had no conversation with General Hamilton on the subject.
Henry Gourdin, sworn. Says he was set down as the purchaser of Rice Hope. Witness purchased for Mrs. Hamilton and her family. General Hamilton owes the Bank of Charleston a debt, for which the Bank has n.o security, to secure which debt, and to assist the family in buying the plantation, they agreed to advance him money. Genera] Hamilton was very desirous that the property should be kept in the family, and supposed that it would sell for considerably less than its value, and a negociation had been going on between himself and the Bank for more than a twelvemonth, and it was finally agreed that the Bank would advance the money to enable him to buy it, upon condition that he would secure the uncovered debt by a mortgage of the property. The whole amount of the uncovered debt was about thirty-two thousand dollars, half of which had been secured by a mortgage of Dr. Hamilton on Fife plantation, and the other half was to be secured by a mortgage of Rice Hope. The debt was to be secured by the following arrangement: Witness was to take the title and immediately assign it to Lynch Hamilton, in trust for Mrs. Hamilton and family. Lynch Hamilton was to have the management of the plantation, and the crops, after deducting between three and four thousand dollars for the expenses, were to be sent to the Bank of Charleston, to be applied to the payment of the debts on the plantation and negroes. Mr. Lynch Hamilton could not be made the purchaser, as he had been a co-partner in his father’s house, and was liable for the engagements of that house ; and to avoid all embarrassments arising from that fact, witness was to be the bidder. The plantation was to be mortgaged to the Bank, to secure the debt; the crops were to be *362 distributed among the debts rateably. There are one hundred and eighty negroes, including forty-five of Mrs. Hamilton’s, all under mortgage except the forty-five. They were to be left on the plantation to assist in working out the debts. Two-thirds of the crops, after deducting expenses as before mentioned, w ere to be sent to the Bank, to pay the first mortgages held by. the Bank, the uncovered debt, and North’s debt, and one-third was to.be retained by Lynch Hamilton to pay the debt and interest for which the negroes were mortgaged. Witness represented Mrs.-Hamilton and family, but under the arrangement which had been made, witness and the Bank of Charleston had no interest to bid against each other. When witness saw Mr. Mem-minger on the day of sale, he mentioned to him that witness, came as the friend of General Hamilton, to make the arrangement which is stated above; that the Bank had agreed to aid him, on condition that their uncovered debt should be secured, That up to one o’clock of the day before the sale, both General Hamilton .and'the Bank of Charleston thought there would be no bidders for the plantation for anything like' its value, and that the parties holding mortgages would not be likely to bid much, as their claims were comparatively small, and the difficulties of settling Sávannah River lands very great, in consequence of the climate. But about that hour, Mr. Adger came into Bank, and upon being asked by Mr. Conner, intimated that there would be bidders. The Bank knew that there was a contingent responsibility of Mr. Adger. It was not said who the probable bidders would be, some thought the Smiths, and some thought Mr. King., About half an Hour before witness first saw Mr. Memminger on the day'of the sale, he saw Mr. Adger, and then learned for the first time from him, who was to be the bidder, and in consequence of that information witness went to Mr. Mem-minger. Witness’ object in going to Mr. Memminger was to prevent the Norths from bidding, as he was well satisfied that if they did not bid, the uncovered debt could be secured — if they did bid, it could not be secured, Witness proposed to Mr. Memminger to give the Norths a new mortgage on the property under the sale, to follow the two mortgages held by the Bank amounting to 22,000 dollars, and to come in before the uncovered debt. Mr. Memminger assented to that arrangement, and it was agreed .that the Norths *363 were not to bid if the property went within the Bank debt; if it went heyond, then the Norths were to take care of themselves. The Bank subsequently agreed to extend their bid to thirty thousand dollars, the Norths’ debt to come in as before after the 22,000 dollars.
Cross-examined. Witness -thinks the plantation is worth about forty thousand dollars. Has not heard, however, of any person desirous to buy it. There is no rice mill on Rice Hope. The mill and settlement are on Pen. ny worth’s Island, which is Mrs. Hamilton’s. The purchase would be hazardous to any one who does not own negroes on Savannah River. The sale was advertised in Charleston, and a very full company was present at the sale. Recollects Dr. King was there. The fale was not hurried, but a fair open sale. Witness did not dissuade any one from bidding, except Mr. Memminger and Mr. Adger. Had no communication with Mr.Mazyck, or those who represented Telfair’s debt, nor was he aware that they intended to bid, and thought it improbable that they would hid, as their claims were too small to admit of their being incumbered with the property. Witness neither said or did anything to prevent them from bidding; nor does he know that any other person said or did any thing to prevent them from bidding. The negotiation with General Hamilton had been going on between twelve and eighteen months, and the terms on which the Bank agreed, were to have the uncovered debt secured.
In reply. Knows only of two bidders at the sale, witness as representing the Hamiltons, and Mr. Conner, President of the Bank of Charleston. The first bid was that of Dr. Hamilton for witness for $5,000; both witness and Mr. Conner bid to carry out the previous arrangement. Witness is a director of the Bank of Charleston, and was one of the committee of the Bank appointed to negotiate the matter; Mr. Conner and Mr. Trenholm and Mr. Adger were the other' members, but Mr. Adger never acted.
 Note. The following is a copy of the testimony taken by Mr. Gray and reported to the court.
Cross-examined. Witness says, in conversation among the parties the plantation was valued at about forty thousand dollars. Witness employed agents to make inquiry what would be its .probable value, and the result was forty thousand dollars. As the sale resulted, Mr. Gourdin is liable for the debts of the Bank of Charleston and of North, amounting to thirty-nine thousand dollars, viz: twenty-two thousand dollars for the Bank, and seventeen thousand for North. Witness had no communication with the intervening mortgagees, and witness is not aware that they had any notice of the arrange *361 ment made. There was a large attendance of persons at the sale; it was a clear fine day. Witness says, the Norths did not come to him to consult about bidding; he had to send i epeatedly to Dr. North to come, and thinks they won Id not have meddled with it, if witness had not taken an interest in the matter, on account of Mrs. Thurston being interested. The sale was perfectly open and fair. Remembers that Dr. King was present at the sale.
In reply. Says there were only .two bidders.
C. G. Memminger called again. Says the creditors fixed the time for the sale of Rice Hope, some of them wishing the credit longer, and some shorter, and finally settling down on the time mentioned in the decree.